FILED

2012 Jul-23  PM 04:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| **FRANKIE SHANE ARNOLD,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **4:11-cv-2783-AKK** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Frankie Shane Arnold ("Arnold") brings this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act ("the Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the final adverse decision of the Commissioner of the Social Security Administration ("SSA").  Doc. 8, at 2.  This court finds that the Administrative Law Judge's ("ALJ") decision - which has become the decision of the Commissioner - is supported by substantial evidence. Therefore, for the reasons elaborated herein, the Court will **AFFIRM** the decision denying benefits.

## I.  Procedural History

Arnold filed his application for Title II disability insurance benefits ("DIB") and Title XVI Supplemental Security Income ("SSI") on February 2, 2009, alleging a disability onset date of January 15, 2009, due to epilepsy and dysthymic disorder.  (R. 56-57).  After the SSA denied his applications on May 20, 2009, (R. 59-63, 65-69), Arnold requested a hearing on June 3, 2009, (R. 70-71), which he received on September 13, 2010, (R. 40-55).  At the time of the hearing, Arnold was 32 years old with an eighth grade education.  (R. 44).  His past relevant work included heavy, semi-skilled work as a tire repairer and auto mechanic helper and medium, unskilled work as a cook helper.  (R. 52).  Arnold had not engaged in substantial gainful activity since January 15, 2009.  (R. 18).

The ALJ denied Arnold's claims on December 13, 2010, (R. 32), which became the final decision of the Commissioner when the Appeals Council refused to grant review on June 6, 2011, (R. 1-4).  Arnold then filed this action on August 5, 2011, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Doc. 1; doc. 8.

## II.  Standard of Review

The only issues before this court are whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the ALJ applied the

correct legal standards, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is "reasonable and supported by substantial evidence." *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 849 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the court must affirm the Commissioner's factual findings even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, it notes that the review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

### III.  Statutory and Regulatory Framework

To qualify for disability benefits, a claimant must show "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

Determination of disability under the Act requires a five step analysis. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f).  Specifically, the Commissioner must determine in sequence:

(1)    whether the claimant is currently unemployed;

(2)    whether the claimant has a severe impairment;

(3)    whether the impairment meets or equals one listed by the Secretary;

(4)    whether the claimant is unable to perform his or her past work; and

(5)    whether the claimant is unable to perform any work in the national economy.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  "An affirmative

answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *Id*. at 1030 (citing 20 C.F.R. § 416.920(a)-(f)).  "Once a finding is made that a claimant cannot return to prior work the burden shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted).

## IV.  The ALJ's Decision

The court turns now to the ALJ's decision to ascertain whether Arnold is correct that the ALJ committed reversible error.  In that regard, the court notes that, performing the five step analysis, the ALJ initially determined that Arnold had not engaged in substantial gainful activity since his alleged onset date, and therefore met Step One.  (R. 18).  Next, the ALJ found that Arnold suffered from the following severe impairments: seizure, headaches, hepatitis C, anxiety, depression, and substance abuse.  (R. 19).  The ALJ then proceeded to the next step and found that Arnold failed to satisfy Step Three because he "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments." *Id*.  Although the ALJ answered Step Three in the negative, consistent with the law, *see McDaniel*, 800 F.2d at 1030, the ALJ proceeded to Step Four, where she determined that:

> [T]he claimant has the residual functional capacity to perform light
> work as defined in 20 CFR 404.1567(b) and 416.967(b) except the
> claimant is not able to climb ramps or stairs. Additionally, he is not
> to climb ladders, ropes or scaffolds. The claimant is also to avoid
> exposure to unprotected heights and hazardous machinery.
> Moreover, he should avoid the operation of motor vehicles and he is
> to avoid being around open bodies of water. Further, the claimant is
> able to understand, remember, and carry out simple instructions but
> not detailed instructions. Additionally, he can attend to simple tasks
> for two hours over an eight hour day. Furthermore, the claimant's
> contact with the general public should be casual and criticism needs
> to be given in a non-confrontational manner. He will also work best
> with a few familiar co-workers. Last, changes in the claimant's work
> setting need to be gradual and infrequent.

(R. 19). Moreover, in light of Arnold's residual functional capacity ("RFC"), the

ALJ held that Arnold is "unable to perform any past relevant work." (R. 31).

Lastly, in Step Five, the ALJ considered Arnold's age, education, work

experience, and RFC, and determined that "there are jobs that exist in significant

numbers in the national economy that the claimant can perform." *Id.* Because the

ALJ answered Step Five in the negative, the ALJ found that Arnold "has not been

under a disability, as defined in the Social Security Act, from January 15, 2009,

through the date of this decision." (R. 32). *See also McDaniel*, 800 F.2d at 1030.

## V.  Analysis

The court turns now to Arnold's sole contention that the ALJ erred by

improperly disregarding the record evidence that "two physicians [Dr. Alterman

and Dr. Ver Hoef] found that [Arnold] was disabled and that both of these physicians, particularly Dr. Alterman, who is the main physician [Arnold] sees, have treated [Arnold] consistently since 2005."  Doc. 8, at 10-11.  Generally, "[i]t is well-established that 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" *Crawford v. Comm'r of Social Security*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).  *See also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The Eleventh Circuit instructs that "good cause" exists when the "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). Additionally, the "ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Lewis*, 125 F.3d at 1440.

Moreover, the court notes that the determination of "disability" under the Act is reserved for the Commissioner.  Thus, the Commissioner is "responsible for making the determination or decision about whether you meet the statutory definition of disability.  In so doing, [the Commissioner] review[s] all of the

medical findings and other evidence that support a medical source's statement that you are disabled. *A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled*." 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) (emphasis added). *See Bell v Bowen*, 796 F.2d 1350, 1353-54 (11th Cir. 1986) ("The regulation in 20 C.F.R. § 404.1527 provides that although a claimant's physician may state he is 'disabled' or 'unable to work' the agency will nevertheless determine disability based upon the medical findings and other evidence."). And indeed, no "special significance" is given "to the source of an opinion on issues reserved to the Commissioner described in" §§ 404.1527(d)(1) and 416.927(d)(1). 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

Here, after a February 2, 2010 follow-up visit with Dr. Lawrence W. Ver Hoef at the Kirklin Clinic's Department of Neurology in Birmingham, Alabama, Dr. Ver Hoef provided that Arnold "is pursuing disability which I fully endorse. He can have his disability lawyer contact me for whatever information he needs." (R. 368). Furthermore, Dr. Ver Hoef noted on May 5, 2010 that "this patient is disabled in my opinion because he has had on average 2 or more seizures per month for over one years time. He also has severe attention difficulties as a result of his TBI. His seizures cause a loss of consciousness and take many hours to recover from. Based on his history it is very unlikely that his condition will

improve significantly in the foreseeable future." (R. 495). In addition, Dr. Adam

M. Alterman, Arnold's physician at Rainbow Healthcare, P.C. in Rainbow City,

Alabama issued a letter stating that "Mr. Arnold has been under my care since

March 2009. He is currently being treated for bipolar disorder and chronic

hepatitis. Due to these conditions Mr. Arnold is unable to work." (R. 371). Thus,

while no "special significance" is afforded Dr. Alterman and Dr. Ver Hoef's

conclusions regarding Arnold's "disabled" status, the court must still consider

whether the ALJ had "good cause" to disregard their medical conclusions.

A.      *Dr. Alterman*

The ALJ rejected Dr. Alterman's conclusions regarding the nature and

severity of Arnold's bipolar disorder and chronic hepatitis because the record as a

whole failed to support such determinations. (R. 25, 371). The court finds no

error in the ALJ's analysis. First, as it relates to hepatitis C, Arnold failed to

mention this impairment as disabling during the hearing and, instead, only

provided that migraines and seizures prevented him from working. (R. 49).

Moreover, Dr. Alterman's own treatment notes reveal only conservative treatment,

if any, for hepatitis. On March 3, 2009, Dr. Alterman provided in a clinical note

that Arnold "complains of Hepatitis C. His symptoms started 15 years ago. His

recent medical treatment include none/nothing." (R. 295). And indeed, the court

finds no indication of disabling hepatitis symptoms in Arnold's 2005 medical records, (R. 218-233, 345-362), the February 9, 2009, February 16, 2009, April 18, 2009, June 22, 2009, March 31, 2010, and April 1, 2010, visits to the Gadsden Regional Medical Center, (R. 273-284, 463-492, 436-462, 423-435, 408-420), other clinical notes by Dr. Alterman, (R. 297-299, 376-403, 499-513), or the 2009 UAB Kirkland Clinic's Department of Neurology clinical notes, (R. 363-369). Thus, the medical record as a whole fails to support Dr. Alterman's conclusion that Arnold is unable to work based on chronic hepatitis.

Similarly, the record evidence taken as a whole fails to support Dr. Alterman's determination that Arnold is unable to work due to bipolar disorder. Again, at the hearing, Arnold provided that migraines and seizures prevented him from working, (R. 49), not bipolar disorder. Moreover, the record reveals minimal treatment for bipolar disorder or other mental impairments such as depression and anxiety. In September 2007, J. Walter Jacobs, Ph.D., diagnosed Arnold with psychotic disorder NOS and antisocial personality disorder as well as alcohol dependence (early full remission claimed), cocaine dependence (remission claimed), amphetamine dependence (remission claimed), and substance induced mood disorder. (R. 242-43). Based on this evaluation in 2007, Dr. Robert Estock found only moderate functional limitations. (R. 254). In April 2009, June

Nichols, Psy.D., reevaluated Arnold and found that Arnold "suffers from a Cognitive Disorder Not Otherwise Specified as well as Chronic Low-Grade Depression.  His ability to relate interpersonally and withstand the pressures of everyday work is moderately compromised due to the nature of his depression and cognitive defects.  He does have deficits which would interfere with his ability to remember and carry out work related instructions.  His comprehension is fair.  Mr. Arnold's cognitive deficits began in 2005." (R. 305).  Thus, Dr. Nichols diagnosed Arnold with dysthymic disorder, cognitive disorder NOS, and polysubstance dependence in remission by patient report.  (R. 304).   As such Dr. Nichols concluded that Arnold's "cognitive deficit" condition "will likely not improve over the next 12 months.  If he were to have his symptoms of depression treated with antidepressant medication, that condition would likely improve over the next 12 months." (R. 305).  Based on this 2009 psychiatric evaluation, Dr. Estock still found that Arnold maintained only moderate functional limitations. (R. 317).

However, beyond these moderate diagnoses, Arnold only received conservative medical treatment for bipolar disorder, anxiety, and depression. Arnold presented anxiety symptoms to Dr. Alterman on June 2, 2009, (R. 378), June 13, 2009, (R. 382-83), August 12, 2009, (R. 384-85), October 7, 2009, (R.

386-87), November 6, 2009, (R. 388-89), and April 27, 2010 (R. 501-02).  Dr.

Alterman originally prescribed Xanax for the anxiety and subsequently

Clonazepam.  *Id.*  The medical evidence reveals no other indication of the severity

and disabling effect of Arnold's anxiety.  Moreover, the medical records reveal

only one specific complaint of moderate bipolar disorder on March 3, 2009, (R.

295), and Dr. Alterman only prescribed Arnold medication for bipolar disorder on

May 8, 2009, (R. 376), January 4, 2010, (R. 395), May 27, 2010, (R. 509), and

June 23, 2010, (R. 511).  Thus, while the medical evidence demonstrates that

Arnold suffers from anxiety and bipolar disorder, the evidence fails to support Dr.

Alterman's finding that Arnold is unable to work because of his bipolar disorder.

Therefore, the ALJ committed no error when he rejected Dr. Alterman's findings.

B.    *Dr. Ver Hoef*

The diagnosis and opinions from Dr. Ver Hoef primarily focus on Arnold's

seizure disorder.  On May 5, 2010, Dr. Ver Hoef stated that Arnold "is disabled in

my opinion because he has had on average 2 or more seizures per month for over

one years time."  (R. 495) (emphasis added).  The medical evidence as a whole

and Dr. Ver Hoef's own treatment notes offer no support for this factual statement

regarding the frequency of Arnold's seizures, and thus, the ALJ properly gave

little weight to Dr. Ver Hoef's disability assessment.  (R. 26).  Additionally, the

court agrees that "Dr. Ver Hoef did not consider the effects of the claimant's substance abuse or non-compliance when making his assessment." *Id.*

On September 28, 2005, Arnold underwent a right frontal craniotomy for resection of mass. (R. 358). On August 11, 2009, Arnold's operating physician provided that, since the operation, Arnold "has had seizures intermittently. Over the last several months he has had one-to-two seizures every four-to-five months. But then he also had two specific episodes of status. On 04/17/2009, he had seven seizures in a row and was hospitalized for about four days and on 06/22/2009 he had 16 seizures in a row over the span of about two hours." (R. 363). On the same day, Dr. Ver Hoef diagnosed Arnold with "[p]artial onset epilepsy with secondary generalization, right frontal lobe in origin." (R. 364). Furthermore, on February 24, 2010, Dr. Ver Hoef provided that "[Arnold] reports doing well since his last visit at which time we added Lyrica. He was suppose to go to 150 mg b.i.d. but for reasons that are not clear, he has only been taking 75 mg twice a day. He feels he has done very well and is having about one to two seizures per month, which he says is as good as he has ever done. He is very pleased that he has not had any episodes of status epilepticus of which he had had two prior to his last visit." (R. 367). Dr. Ver Hoef also noted that he "documented that [Arnold] had had only two seizures in the previous four months other than his episodes of status

epilepticus, but now he says that he has always had seizures at least one to two times per month." *Id.* Dr. Ver Hoef concluded in his "Impression" that Arnold suffered from "complex partial seizures with history of status epilepticus, much improved but still intractable." *Id.*

At the hearing, Arnold testified that he experienced seizures "about every three months," (R. 46), and Arnold complained to Dr. Alterman on June 11, 2009 regarding seizures, (R. 380), and went to the emergency room for seizures on June 22, 2009, (R. 436-462), but there are no other complaints of seizures until November 6, 2009, even though Arnold stated that the episodes occur 1 to 2 times per month, (R. 388). Indeed, Arnold next complained of a seizure on January 4, 2010 despite visiting Dr. Alterman on November 20, 2009 for a motorcycle accident and December 3, 2009 for a rash/skin lession. (R. 390-395). And similarly, Arnold's next seizure complaint occurred on April 1, 2010, when Arnold presented to the Gadsden Regional Medical Center for two seizures in a six hour period. (R. 410-420). Dr. Alterman's treatment notes reveal no seizure complaints from April 16, 2010 through June 23, 2010. (R. 499-511). Accordingly, as found by the ALJ, Arnold's seizure disorder constitutes a severe impairment; however, the medical evidence fails to support the frequency of these

seizures that led Dr. Ver Hoef to find Arnold "disabled."[1]

Moreover, the medical records from Arnold's seizure-related hospital visits reveal noncompliance with prescribed medication.  Arnold first presented to the Gadsden Regional Medical Center for seizures on April 18, 2009.  (R. 463-490).  Dr. Olga Bogdanova provided that Arnold "has a history of seizure disorder and apparently was noncompliant with his medications.  He presented with multiple breakthrough seizures.  Since admission to the Intensive Care Unit for observation he did not have any further seizure activity."  (R. 466).  Dr. Bogdanova further stated that a "CT scan of the head revealed presence of right frontal encephalomalacia as well as evidence of right frontal craniotomy without any acute findings.  EEG was essentially normal except for mild intermittent right hemispheric slowing which was not specific.  There was no evidence of epileptiform discharge or seizures."  *Id.*  Arnold's "[u]rine toxicology screen was

---

[1] The court also agrees with the ALJ that Arnold's seizures fail to meet the relevant "listed" impairment in 20 C.F.R. 404, Subpart P, Appendix 1.  (R. 19).  Listing 11.02 for convulsive epilepsy requires "documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment."  20 C.F.R. 404, Subpart P, Appendix 1, section 11.02.  Listing 11.03 for nonconvulsive epilepsy requires "documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day."  20 C.F.R. 404, Subpart P, Appendix 1, section 11.03.  Not only is there insufficient "documented descriptions" of the requisite frequency of seizures, but there is also evidence that, on multiple occasions, Arnold's physicians found noncompliance with prescribed medication.  *See* (R. 437, 468).

positive for barbiturates and methadone." *Id.* As such, Dr. Bogdanova concluded that "Mr. Arnold is a 29-year-old man who presents with breakthrough seizures due to noncompliance with medication possibly due to drug abuse." (R. 468).

Arnold again presented to the Gadsden Regional Medical Center on June 22, 2009 with "status epilepticus." (R. 436-462). Dr. Alterman admitted Arnold and provided "patient is status post resection of a brain tumor in 2005, hepatitis-C and seizure disorder. Has been on anti-epileptic medication since and has both been noncompliant and even with compliance has had issues with recurrent seizures. He was found to have a seizure that continued unabated. Paramedics were called and he was ultimately admitted to the emergency department." (R. 437). Lastly, Arnold returned to the Gadsden Regional Medical Center on April 1, 2010 because he "suffered a single isolated seizure and then had a second one 2.5 hours later. Duration of seizure was approximately 20 seconds." (R. 410). When admitted, Arnold exhibited decreased consciousness, confusion, and headache, but presented "negative apnea, negative fecal incontinence, negative fever, positive postictal symptoms, negative loss of consciousness, negative nausea, negative urinary incontinence, negative vomiting, [and] negative trauma." *Id.* The medical records for this visit provide that Arnold was compliant with his medications. (R. 414).

The federal regulations establish that "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work . . . . If you do not follow the prescribed treatment without good reason, we will not find you disabled . . . ."  20 C.F.R. §§ 404.1530, 416.930.  Dr. Ver Hoef's "disability" finding fails to account for the effect that Arnold's medication noncompliance had on the nature and severity of his seizures.  "[T]he claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).  Therefore, as Arnold's medical records indicate certain noncompliance with prescription medication, the substantial evidence supports the ALJ's decision to give little weight to Dr. Ver Hoef's conclusions because they fail to account for the noncompliance.  (R. 437, 468). Put differently, "the ALJ's consideration of [Arnold's] noncompliance as a factor in discrediting [Arnold's] allegations of disability is adequately supported by" Dr. Bogdanova's finding that noncompliance caused the seizures in April 2009.  *See Ellison*, 355 F.3d at 1275.

Furthermore, the ALJ properly rejected Dr. Ver Hoef's conclusions because he failed to account for the effect of substance abuse on Arnold's impairments. *See Doughty v. Apfel*, 245 F.3d 1274, 1279-80 (11th Cir. 2001).  Generally, "once

the Commissioner determines a claimant to be disabled and finds medical evidence of drug addiction or alcoholism, the Commissioner then 'must determine whether . . . drug addiction or alcoholism is a contributing factor material to the determination of disability.'  20 C.F.R. § 404.1535.  The key factor in determining whether drug addiction or alcoholism is a contributing factor material to the determination of a disability (the 'materiality determination') is whether the claimant would still be found disabled if he stopped using drugs or alcohol."  *Id.* at 1279 (citing 20 C.F.R. § 404.1535(b)(1)).  Moreover, "the claimant bears the burden of proving that his alcoholism or drug addiction is not a contributing factor material to his disability determination."  *Id.* at 1280.  Thus, here, there is no evidence that the two physicians finding Arnold disabled also considered whether Arnold's alcohol and drug abuse constitutes a "contributing factor" to this purported disability.  To the contrary, Dr. Bogdanova found that Arnold's drug abuse contributed to noncompliance with medications and the resulting seizures. (R. 468).  Based on the Eleventh Circuit's instruction in *Doughty*, the ALJ committed no error by affording Dr. Ver Hoef's conclusions less than controlling weight for this reason.

Finally, in reviewing the record as a whole, the ALJ properly discredited Arnold regarding the severity of his impairments based on inconsistent statements

concerning alcohol and substance abuse.  (R. 27).  On February 24, 2009,

approximately two months before his first visit to the emergency room for

seizures, Arnold completed a "Drug and Alcohol Use Questionnaire."  (R. 182-

183).  In addressing the extent of his daily alcohol and drug use, Arnold provided

that he used "all I can find or get!" and "any and all" kinds of alcohol and drugs.

(R. 182).  Arnold also maintained that he used drugs and/or alcohol for weeks and

months at a time without stopping and has DTs when he stops.  *Id.*  Moreover,

Arnold's grandmother Mary Joyce Huey, with whom Arnold lived at the time,

stated on February 24, 2009 that Arnold uses "beer[,] hard liquor[,] cheap wine[,]

any and all kind of pills[.]  I do not know where he gets them," and that, as a

result, she has to keep her medications locked up."  (R. 179).  Ms. Huey further

provided that Arnold has attended detox programs or has been hospitalized for

drug or alcohol use.  (R. 180).  On April 7, 2009, after reviewing the medical

evidence of record, Dr. R. Glenn Carmichael reported in the physical summary of

his Disability Determination that Arnold "states []he daily abuses drugs and

alcohol."  (R. 306).  Two weeks later, however, on April 20, 2009, Dr. Nichols

provided in her psychological evaluation that Arnold "started abusing alcohol at

the age of 12.  At his worst, he would drink 1/2 gallon of bourbon in a sitting.  He

stated that he stopped abusing alcohol one year ago.  In addition, he has abused

cannabis, cocaine, and IV methamphetamine.  He stated he stopped abusing those substances two years ago." (R. 303).  At the hearing on September 13, 2010, Arnold testified that he only abused his pain medication but no longer has a drug problem.  Arnold also denied taking street drugs.  (R. 45-46).  As Arnold bears the burden to prove disability, *see Ellison*, 355 F.3d at 1276, these inconsistent statements about alcohol and substance abuse negatively impact his credibility regarding the ability to engage in substantial gainful activity.

In sum, Arnold contends that the ALJ erred by neglecting to give Dr. Alterman and Dr. Ver Hoef's "disabled" determinations controlling weight.  However, the federal regulations leave the ultimate disability determination to the Commissioner, and, accordingly, there is no requirement to give a claimant's physician, even treating physician, controlling weight on the final disability issue.  Moreover, the medical evidence as a whole fails to support Dr. Alterman and Dr. Ver Hoef's conclusions.  While it is clear that Arnold suffers from severe impairments, the record evidence nonetheless substantiates the ALJ's finding that these impairments, even in combination, are not so severe as to prevent Arnold from working.  The ALJ also properly discredited Arnold's testimony regarding the nature and severity of his impairments and gave proper consideration to Arnold's alcohol and substance abuse and noncompliance with prescribed

medication.

## VI.  Conclusion

Based on the foregoing, the court concludes that the ALJ's determination

that Arnold is not disabled is supported by substantial evidence, and that the ALJ

applied proper legal standards in reaching this determination.  Therefore, the

Commissioner's final decision is **AFFIRMED**.  A separate order in accordance

with the memorandum of decision will be entered.


Done the 23rd day of July, 2012.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE